Crystal Amusement Company v. Commissioner.
Crystal Amusement Co. v. Commissioner
Docket No. 22795.
United States Tax Court
1950 Tax Ct. Memo LEXIS 298; 9 T.C.M. (CCH) 50; T.C.M. (RIA) 50023; January 18, 1950
*298 James E. Hindman, Esq., State Theatre Bldg., Pittsburgh 22, Pa., and M. S. Sieger, C.P.A., for the petitioner. Albert J. O'Connor, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner assails respondent's determination of deficiencies for the year 1945 in the amounts of $4,325.26 in income tax and $4,811.66 in excess-profits tax. Certain adjustments are not contested. The issues in dispute are: (1) Whether petitioner is entitled to a deduction of $14,500 upon the ground that advances previously made to State Theatres Corporation constituted a debt which became partially worthless in 1945. (2) Whether amounts owed under a guaranty agreement constituted borrowed invested capital under section 719 of the Internal Revenue Code. Findings of Fact Petitioner filed its returns for the period involved with the collector for the twenty-third district of Pennsylvania. Petitioner and State Theatres Corporation, hereinafter called State, are Pennsylvania corporations with offices in Pittsburgh, Pennsylvania. James B. Clark Company, Inc., is a Delaware corporation with office and principal place of business *299 in Pittsburgh, Pennsylvania. Petitioner operates a motion picture theatre located at Braddock, Pennsylvania. The land and building in which this theatre is located are owned by petitioner. State owns and operates a motion picture theatre and office building located at 335 Fifth Avenue, Pittsburgh, Pennsylvania. Petitioner and State occupy the same offices and the administrative functions of both corporations are performed by substantially the same officers and employees. This mutual arrangement has resulted in savings to petitioner. The following were the officers, office salaries, and office expenses of petitioner and State for the years 1943 to 1945: OFFICERS AND OFFICE SALARIES
Lloyd C.
James B.
Jas. E.
A.P.
English, Asst.
Clark, Pres.
Hindman,
Gillespie,
Secy. &
Other
& Treas.
V.P. & Secy.
Gen. Agt.
Asst. Treas.
Office
1943
Petitioner
$10,400.00
$1,080.04
$2,470.00
$1,590.00
State Theatres
5,200.00
1,404.00
3,640.00
1,325.00
$1,375.00
1944
Petitioner
10,600.00
1,080.04
2,517.50
1,590.00
State Theatres
5,300.00
1,404.00
3,710.00
1,325.00
11,375.00
1945
Petitioner
10,600.00
1,080.04
2,565.00
1,610.00
530.00
State Theatres
5,300.00
1,404.00
3,780.00
1,325.00
1,375.00
*300 OFFICERS AND OFFICE SALARIES
Total Officers
& Office
Salaries
1943
Petitioner
$15,540.04
State Theatres
12,944.00
1944
Petitioner
15,787.54
State Theatres
13,114.00
1945
Petitioner
16,385.04
State Theatres
13,184.00
OTHER OFFICE EXPENSES
Soc. Sec.
Taxes (app.
Legal and
General
to above
Account-
Office
Tele-
Office
salaries)
ing Fees
Rent
phone
Expense
1943
Petitioner
$325.60
$ 185.00
$1,000.00
$ 50,00
$116.00
State Theatres
404.16
165.00
212.71
481.45
1944
Petitioner
327.48
200.00
1,000.00
60.00
81.00
State Theatres
404.16
175.00
207.79
512.09
1945
Petitioner
351.40
200.00
1,000.00
52.00
373.00
State Theatres
404.16
1,142.37
248.75
429.55
TOTAL
Total Other
All
Office
Administra-
Expenses
tive Expenses
1943
Petitioner
$1,676.60
$17,216.64
State Theatres
1,263.32
14,207.32
1944
Petitioner
1,668.48
17,456.02
State Theatres
1,299.04
14,413.04
1945
Petitioner
1,976.40
18,361.44
State Theatres
2,224.83
15,408.83
The stockholders and the shares held by each in the three corporations *301 are as follows: PETITIONER
Preferred
Common
% of total
% of total
Shares
outstanding
Shares
outstanding
James B. Clark Company, Inc.
1,840
98%
44
61%
James E. Hindman
37
2
28
39
1,877
100%
72
100%
STATE THEATRES CORPORATION
Capital stock
(all of one class)
% of total
Shares
outstanding
James B. Clark Company, Inc.
3,500
77.7%
James E. Hindman
1,010
22.3
4,510
100.0%
JAMES B. CLARK COMPANY, INC.
% of total
Shares
outstanding
James B. Clark
11,100
58%
Gertrude Clark Gellatley (Daughter)
4,000
21
Mary Clark Willey (Daughter)
4,000
21
19,100
100%
State owns the property at 335 Fifth Avenue, Pittsburgh, Pennsylvania, subject to a mortgage to Fidelity Trust Co., hereinafter called Fidelity, dated June 23, 1923, securing the repayment of a loan in the principal amount of $450,000, of which amount $410,000 remained unpaid on July 26, 1940, and $380,000 remained unpaid on December 26, 1945. In July, 1940, State had a deficit in surplus, and the debt service charges had exceeded State's income for several years. James B. Clark, *302 president of both petitioner and State, was then aware of those facts. It was his opinion at that time that the amount of the mortgage lien exceeded the market value of the property. During the year 1940 State was not in a position to make payments to Fidelity on the mortgage, and foreclosure was threatened. An arrangement was made with Fidelity whereby it was agreed that foreclosure would be withheld if all current delinquent taxes, all interest on the mortgage, and semi-annual payments on principal of $5,000 each were made until a total of $50,000 had been paid on the principal, and if such payments were guaranteed by petitioner. On July 26, 1940, the board of directors of petitioner approved a corporate resolution guaranteeing the payment by State of $50,000 of the unpaid principal of the mortgage, in ten semi-annual installments, together with taxes and interest. On the same day petitioner delivered to Fidelity a copy of the resolution of its board of directors under the title "GUARANTY AGREEMENT," and a second mortgage in the principal amount of $50,000 on petitioner's real estate at Braddock, Pennsylvania. The execution and delivery of the corporate resolution and mortgage *303 to Fidelity were duly authorized by the stockholders and directors of petitioner at meetings held on July 26, 1940. Fidelity did not sign the document entitled "GUARANTY AGREEMENT." Fidelity did not consider that the mortgage was suitable for definite extension and did not agree that it would be extended for any definite period of time. Foreclosure was delayed from day to day. The balance sheets of State as of January 1, 1940, and December 31, 1940, are as follows: ASSETS
Jan. 1, 1940
Dec. 31, 1940
Cash
$ 3,005.01
$ 167.10
Notes and accounts receivable
8,288.15
8,340.57
Prepaid items
1,112.42
2,184.11
Buildings and equipment (less reserve for depreciation)
235,978.50
224,998.09
Land
374,724.87
374,724.87
Good will
24,690.69
24,690.09
Organization expense
2,924.22
2,924.22
$650,723.26
$638,029.05
LIABILITIES
Accounts payable
$ 1,584.61
$ 9,323.93
Bonds, notes and mortgages payable
410,000.00
410,000.00
Accrued expenses (interest and taxes)
47,653.95
46,051.67
Capital stock
451,000.00
451,000.00
Earned surplus deficit
272,515.35
278,346.55
$650,723.26
$638,029.05
On July 26, 1940, there was an outstanding *304 balance of $9,000 on amounts previously advanced by petitioner to State and not repaid. Between July 26, 1940, and December 26, 1945, petitioner advanced the sum of $30,000 to be applied in part payment of the mortgage principal, $10,000 being paid in the year 1943 and $20,000 during the year 1945. The payments so made by petitioner to Fidelity were credited on that company's books against the guarantee of petitioner. Petitioner advanced additional amounts during that period to be applied in payment of taxes and interest. The amounts intended to be applied in payment of taxes and interest were paid to State; amounts to be applied on the mortgage principal were paid directly to Fidelity but were treated by petitioner as advances to State. On December 26, 1945, State owed petitioner the sum of $64,500. Petitioner's ledger account with State shows the following advances during 1945: Date
Amount
Jan. 20, 1945
$ 2,000
April 21, 1945
10,000
July 24, 1945
3,000
Nov. 19, 1945
10,000
$25,000
Dec. 29, 1945 (credit)
1,000
Net amount advanced in 1945
$24,000
Meetings of the board of directors of petitioner and State were held on December 26, 1945. Clark and *305 Hindman constituted a quorum of the board of each of the corporations and were the only persons present at the two meetings. On the same day, pursuant to resolutions adopted at those meetings, petitioner accepted a promissory note of State in the principal amount of $50,000, payable in one year and bearing interest at 2 per cent per annum, in full settlement of the balance due of $64,500. On the same day the sum of $14,500 was charged off on the books of petitioner as a partially worthless debt. The State stock held by the J. B. Clark Company has never been charged off as worthless by the latter. The balance sheets of State as of January 1, 1945, and December 31, 1945, are as follows: ASSETS
Jan. 1, 1945
Dec. 31, 1945
Cash
$ 2,604.21
$ 4,871.33
Accounts receivable
6,913.69
8,446.60
Building (less reserve for depreciation)
179,447.94
168,274.72
Land
374,724.87
374,724.87
Prepaid items
2,263.21
1,753.91
Organization expense
2,924.22
2,924.22
Good will
24,690.09
24,690.09
$593,568.23
$585,685.74
LIABILITIES
Accounts payable
$ 2,734.43
$ 1,096.96
Due Crystal Amusement Company
39,500.00
49,000.00
Mortgage payable (held by Fidelity Trust Co.)
400,000.00
380,000.00
Accrued taxes
5,705.55
3,944.87
Capital stock
451,000.00
451,000.00
Earned surplus (deficit)
(305,371.75)
(299,356.09)
$593,568.23
$585,685.74
*306 Robert A. MacDowell was offered by petitioner and accepted by respondent as an expert witness. He testified that in February, 1943, he had appraised the land and building owned by State at $296,500, and that he had appraised the value of the property on December 31, 1945, at $400,000, estimating the value of the land at $340,000 and the building at $60,000. The assessed valuation in 1945 was $394,250, consisting of $339,250 for the land and remainder for the building. The fair market value of the land and building owned by State increased, in the period between July 26, 1940, and December 26, 1945, not less than $103,500. In 1945 the value of that property was not less than $400,000. State's net worth was greater on December 26, 1945, than on July 26, 1940. The profit, loss and deficit figures of State for the years 1936 through 1945 were shown on its books as follows: Profit
or
Loss Before
Deficit as
Year
Depreciation
Depreciation
Net loss
of Dec. 31
1936
($ 4,334.16)
$ 12,109.11
($ 16,443.27)
($217,565.80)
1937
( 964.42)
11,954.67
( 12,919.09)
( 230,484.89)
1938
( 7,515.94)
11,954.67
( 19,470.61)
( 249,865.37)
1939
( 13,834.49)
12,225.30
( 26,059.79)
( 272,515.30)
1940
6,350.69
12,247.30
( 5,896.61)
( 278,346.55)
1941
11,310.22
12,247.30
( 937.08)
( 279,222.11)
1942
6,096.31
12,247.30
( 6,150.99)
( 285,323.54)
1943
5,826.04
12,247.30
( 6,421.26)
( 291,680.31)
1944
( 1,624.33)
12,247.30
( 13,871.63)
( 305,371.75)
1945
1,419.78
12,068.91
( 10,649.13)
* ( 313,856.09)
$ 2,729.70
$121,549.16
($118,819.46)
*307 During the years 1946, 1947, and 1948 petitioner advanced further sums to State, and State made some repayments to petitioner. At an undisclosed date, petitioner's directors accepted from State, in lieu of the one-year 2 per cent promissory note for $50,000, a new note for $50,000 payable on demand without interest. The last entry in petitioner's ledger account with State was made on April 29, 1948. The outstanding balance of the amounts advanced by petitioner and not repaid by State as of the date of the hearing was $87,500. Opinion On the principal issue we cannot find that petitioner's claim against State became worthless to any extent in the tax year in issue. Petitioner could, of course, if a guarantor of the debt of an insolvent debtor, claim a bad debt deduction for any enforced payments. Shiman v. Commissioner (C.C.A., 2nd Cir.), 60 Fed. (2d) 65. But the evidence is clear, and proceeds in fact from petitioner's own witness, that State's property was worth considerably more in 1945, the year before us, than it had been in 1940, when petitioner undertook whatever obligation may have resulted in the *308 payments. We cannot say with certainty whether State was solvent in 1945 or insolvent in 1940, and we have accordingly made no finding in this respect since the conclusion would be identical on either state of facts. Because State's condition unquestionably improved between the two dates, it was necessarily insolvent in 1940 if it was in 1945. And if it was solvent in 1940, petitioner's obligation was clearly collectible in full in 1945. Whether, therefore, we say that State being able to pay in 1945, petitioner cannot deduct any part of the obligation as a worthless debt, section 23(k)(1), Internal Revenue Code, or whether we say that due to State's poor financial condition in 1940 petitioner's agreement of guaranty could have contemplated no more than a contribution to State's capital for a gift, American Cigar Co. v. Commissioner (C.C.A., 2nd Cir.), 66 Fed. (2d) 425, certiorari denied, 290 U.S. 699, the result is thus the same. And the close relationship between the two corporations furnishes adequate explanation of why a contribution to State's capital or a gift might have been made by petitioner. The third alternative, that State *309 might have been insolvent in 1940, and able to pay in 1945, would defeat petitioner's contention on both grounds. Respondent was hence justified in rejecting the claim of partial worthlessness on any view of the facts. The remaining question is whether petitioner's secondary obligation to the bank, evidenced though it might have been by a mortgage, can be included in its borrowed invested capital for excess-profits tax purposes under section 719. Since, as we have found on the basis of the testimony of petitioner's own valuation witness, the property upon which the bank held a mortgage for State's primary obligation was worth not less than the amount of State's indebtedness to the bank, the bank's mortgage was collectible in full, Benton Harbor State Bank, 20 B.T.A. 1106, and petitioner's secondary liability did not constitute an indebtedness at all. See Estate of Charles H. Lay, 40 B.T.A. 522, 528. And the mere fact that petitioner may have been secondarily liable for an indebtedness which is the primary obligation of another, even though evidenced by a mortgage, does not permit it to include the amount as an "outstanding indebtedness" as that term is used *310 in the excess-profits tax provisions. Player Realty Co., 9 T.C. 215. Decision will be entered for the respondent. Footnotes
*. Before charge-off and credit of $14,500 to surplus.↩